IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARL E. THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 02 C 8848 |
| | ) | |
| v. | ) | Suzanne B. Conlon, Judge |
| | ) | |
| GUARDSMARK, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Carl Thomas ("Thomas"), a security guard, claims Guardsmark, Inc. ("Guardsmark") terminated his employment because of statements he made during a November 2001 television interview. Specifically, during the interview Thomas disclosed that a convicted felon worked at an oil refinery as a security guard. Thomas contends he participated in the interview to protect the public from terrorist attacks in the wake of September 11, 2001, and that his termination constitutes retaliatory discharge in violation of Illinois public policy. Guardsmark contends Thomas' retaliatory discharge claim is time barred by his employment agreement, which required him to bring his wrongful discharge claim within six months of termination. In addition, Guardsmark contends Thomas was terminated for violating company policy.[1] Guardsmark moves for summary judgment pursuant to Fed. R. Civ. P. 56.

---

[1] This court granted Guardsmark's Rule 12(c) motion for judgment on the pleadings and held Thomas' retaliation claim was time barred under the employment agreement. *Thomas v. Guardsmark*, No. 02 C 8848, 2003 U.S. Dist. LEXIS 1649 (N.D. Ill. Feb. 4, 2003). The Seventh Circuit reversed and remanded for a determination of when, if ever, Thomas' indefinite suspension became an actual discharge. *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 709 (7th Cir. 2004).

1

## BACKGROUND

### A.    Guardsmark Hires Thomas

Guardsmark provides uniformed security personnel to businesses. In September 1998, Thomas was hired by Guardsmark to work as a security officer in the Chicago area. On September 21, 1998, Thomas signed Guardsmark's employment agreement which stated "any legal action or proceeding relating to or arising out of this Agreement or the employment of Employee by GUARDSMARK must be brought by Employee within six months of the date the cause of action arose or it shall be time-barred." Guardsmark Ex. F.

Thomas also received a copy of Guardsmark's "General Orders, Regulations and Instructions for Uniformed Personnel" ("GORI"). The GORI is the most important source of job-related information for uniformed security personnel; GORI is considered part of the Guardsmark uniform and must be carried at all times during working hours. Guardsmark employees are expected to read and become thoroughly familiar with GORI regulations and instructions. Compliance with GORI rules is an essential function of a security officer's position. The GORI requires security officers to:

> -Maintain undivided loyalty to the company. Always act in the best interests of the company, and avoid even the appearance of any conflict of interest.
>
> -Use company . . . information only for company business and company gain.
>
> -Be conscientious and responsible in both customer and company relationships.
>
> -Respect and maintain the confidentiality of all proprietary and personal information of Guardsmark and its customers.
>
> -Advise fellow employees when it appears their actions may be in violation of this code, and if appropriate, report the situation to management or to the corporate ethics committee. To the extent it is legally and practicably possible, the company will keep confidential the identity of anyone reporting a possible violation.

-Obtain written permission from the customer before using the business relationship to our advantage in any way, such as revealing our customers' names or identifying the facilities that we service.

-While on duty you must follow the chain of command and report only to your immediate supervisor . . . do not register complaints with any representative of the client. . . . While on duty, you will . . . report to your superior at once all information, complaints or observations about protection problems.

Guardsmark Ex. H. Thomas never read the GORI.

In February 2000, Thomas was assigned to Guardsmark's CITGO Petroleum account.

CITGO operates an oil refinery in Lemont, Illinois that produces oil for gasoline and petroleum.

Thomas received and read the "Mission Partnership Statement" for the CITGO account ("MPS"),

which contains additional rules and instructions, including:

> As a Security Officer at [Citgo Petroleum Group], you may sometimes be approached or contacted by members of the media who ask for sensitive information about emergency situations at the facility, like a fire, an injured worker, a building malfunction, crime, or personnel changes within management.
>
> Follow this procedure to handle such requests:
>
> - Do not discuss or release any sensitive information to the media, even if it is 'off the record.' You are not authorized to discuss ANY information regarding [Citgo Petroleum Group] or Guardsmark with any member of the media.
>
> - Forward all media calls and written media requests to the Public Relations Department. You can find telephone numbers for the Public Relations Department in the Corporate Telephone Directory.
>
> - Once contact has been established between the media and an authorized [Citgo Petroleum Group] spokesperson, only that spokesperson should respond to further inquiries.

*See* Guardsmark Ex. E at ¶¶ 18-26.

3

### B. Thomas Meets Kubera

Bart Kubera was also assigned to the CITGO account as a security officer. Kubera told Thomas that he had a criminal record. Thomas contends he conveyed Kubera's criminal history to "Fred," who drove a CITGO vehicle and wore a police officer uniform. Thomas did not know whether Fred worked for CITGO or Guardsmark, but believed he was the liaison committee representative for Guardsmark at CITGO and a City of Lemont police officer. Thomas chose to tell Fred because he thought Fred, as a police officer, would be able to investigate whether Kubera had a criminal record. Fred told Thomas he would investigate Kubera's criminal history and, about a week later, indicated he was still looking into the matter. Thomas never specifically informed his supervisor Mark Kempke about Kubera's alleged criminal record. About two weeks after his conversation with Fred, Kempke told Thomas that "anything that had to do with employees on that site, they would deal with it, not Fred." Thomas Ex. I at 28-29. Thomas understood by "they" Kempke meant Guardsmark. *Id.*

### C. CBS News Interviews Thomas

In November 2001, CBS News reporter Pam Zekman contacted Thomas about a media interview. Zekman knew Thomas was a Guardsmark employee and that he worked on the CITGO account. Thomas believes Zekman knew that he worked for Guardsmark from his Title VII suit against the company.[2] Guardsmark asserts Thomas did not inform anyone at Guardsmark about the call. Thomas claims he discussed the interview request with Lieutenant Phil Baldwin, who gave him permission to participate in the interview. Thomas did not refer the inquiry to the public relations

---

[2]Thomas filed suit against Guardsmark in 2001, alleging Title VII discrimination. Judge Rebecca Pallmeyer granted summary judgment in Guardsmark's favor. *Thomas v. Guardsmark*, No. 01 C 4300, 2002 U.S. Dist. LEXIS 15906 (N.D. Ill. Aug. 26, 2002).

4

department. The interview aired on November 9, 2001. During the course of the interview, Thomas told Zekman that he was aware of felons working as security guards. Thomas indicated that the CITGO refinery produces gas and that he thought the CITGO facility was a likely target for terrorists. Thomas did not identify Guardsmark as his or Kubera's employer, nor did the telecast directly mention Guardsmark. Thomas did not identify CITGO as the site where he and Kubera worked together. Zekman indicated Kubera no longer worked for the security company that employed him at the CITGO refinery because his license application had been denied. She further stated Kubera worked at the CITGO site the previous year. The CBS news interview lasted approximately 45 minutes; the actual air time during which Thomas appeared was about 30 seconds.

Thomas agreed and understood that no part of the Guardsmark uniform was to be worn other than at work or commuting directly to and from work. The Guardsmark uniform includes a long sleeve white guard shirt, black tie, charcoal gray pants, a badge and flashlight. The Guardsmark uniform bears the "Guardsmark" name. Thomas Ex. A at 50. During the interview Thomas looked like a security officer and wore a long sleeve white guard shirt, a black tie, black pants, a shield and a flashlight. While Thomas intentionally looked like a security officer, it is undisputed that Thomas was not wearing his Guardsmark uniform while on camera.[3]

### D. Thomas is Suspended

The day after the CBS interview aired, Guardsmark's vice-president and regional manager, Edward Healy, reviewed a tape of the broadcast. The broadcast caught the attention of many people at Guardsmark, including Healy's superior, Douglas Kley. Healy met with Thomas on November

---

[3] Guardsmark asserts this fact is undisputed, "except that . . . Thomas could not tell whether he was wearing his Guardsmark tie." *See* Guardsmark Resp. to Thomas Facts at ¶ 120.

16, 2001, and suspended him indefinitely without pay. Healy contends he suspended Thomas because he violated company policy by appearing on a broadcast without receiving authorization through the proper chain of command and because he disclosed information about a client location. *See* Thomas Ex. A at p.49. Healy suspended Thomas, instead of outright terminating him, because he was aware that Thomas had a pending Title VII lawsuit against the company and he wanted to investigate whether Thomas received authorization to speak with Zekman "to make sure we were being fair." Thomas Mem. Ex. A. at 53-54. When Thomas asked Healy whether he should turn in his uniform, Healy responded "only if you want to." *Id.* at Ex. I at 48. Thomas did not perform any work or receive a paycheck from Guardsmark after November 2001. Thomas' last trip to a Guardsmark office or account was in December 2001, when he retrieved a bag of change from his locker.

Healy had never indefinitely suspended an employee prior to his suspension of Thomas, but he had previously terminated between 30 and 40 employees. Healy asked Paul Halm and Rod Peterson, who both worked on the CITGO account, to determine whether Thomas informed anyone about the media interview or Kubera's alleged criminal history. This request was the extent of Healy's investigation to determine whether Thomas complied with the GORI and MPS rules. According to Healy, Halm and Peterson both told him in mid-January 2002 that Thomas had not received authorization to appear on the broadcast, nor did Thomas inform anyone at Guardsmark that another security officer allegedly had a criminal record.

E.  **Unemployment Benefits**

In December 2001, Thomas applied for unemployment benefits with the Illinois Department of Employment Security ("IDES") and indicated on his application that he had been suspended. An

IDES employee informed Thomas that he was not entitled to unemployment benefits because she had spoken to Guardsmark and he was only suspended and should be called back to work. Thomas re-applied for unemployment benefits in January 2002. His application indicated he was no longer working for Guardsmark because he was "suspended (constructive discharge)" and "Constructive discharge (suspended since Nov. 16, 2001 - pending investigation)." Thomas Mem. Ex. K. On February 11, 2002, the IDES sent Thomas a letter notifying him that he was entitled to unemployment benefits beginning January 6, 2002 because Thomas was discharged for speaking to a television reporter. *Id.* Thomas received benefits for nine months, from January 2002 through September 2002.

### F. Guardsmark's Termination Procedures

Typically, once a termination decision is made, Guardsmark's internal procedures include: (1) instructing the employee to return uniform items and other items issued by Guardsmark; (2) checking off the employee's uniform card to ensure that all items have been returned; and (3) filling out a 301 form, which is forwarded to Guardsmark's administrative headquarters in Memphis for processing and then returned to the Chicago office for filing.

On January 3, 2002, Deborah Decker, an attorney for Guardsmark, sent Thomas a letter regarding his Title VII suit stating: "in response to your question during our telephone conversation this morning regarding the status of Guardsmark's investigation concerning your employment, Guardsmark will advise you when it completes its investigation and reaches its decision." Thomas Mem. Ex. B at 17. Healy did not communicate with Thomas after completion of his investigation in mid-January 2002, nor did he instruct anyone at Guardsmark to communicate with Thomas. Healy did not discuss Thomas' employment status with any Guardsmark employee after the

7

investigation was completed or instruct anyone to complete a 301 form for Thomas. In August 2002, Guardsmark obtained summary judgment against Thomas in his Title VII suit. Three months later, in November 2002, a 301 form reflecting Thomas' termination was completed. The 301 form: (1) is dated November 1, 2002; (2) contains signature stamps from the human resources and regulatory compliance departments in Memphis dated November 12 and November 14, 2002; and (3) states Thomas' last date worked was November 15, 2001. *See* Thomas Mem. Ex. B at 11.

### G. Thomas' 401(k) Account

Thomas did not make any contributions to his 401(k) account after November 2001. He requested withdrawal of his 401(k) funds in March 2002. In completing a form to obtain the funds, Thomas stated his termination date was November 16, 2001. However, when Thomas requested withdrawal of his 401(k) funds, Guardsmark provided him with a hardship withdrawal request form because the computer did not reflect his employment as terminated. Thomas returned the completed hardship withdrawal request form and Guardsmark denied his request on March 15, 2002. Healy was aware of Thomas' request, but did not tell anyone to issue Thomas a refund of his 401(k) funds because Healy was "sort of out of the loop at that point." Thomas Mem. Ex. A. at 56.

On October 25, 2002, Thomas' attorney sent Guardsmark a letter requesting disbursement of Thomas' 401(k) funds. Upon receipt, Melinda LeVerne faxed the October 25th letter to Sue Reiher in the Chicago office with a fax cover sheet that stated "If for some reason Mr. Thomas will not be termed, please fax that info to me." Thomas Mem. Ex. B. at 6. LeVerne wrote a note on October 29, 2002: "Left msg. for T. Huizenga [Thomas' counsel] explaining situation & that I would forward info. to branch office so they can contact Mr. Thomas. Also will forward w/d papers to him (Mr. Thomas)." *Id.* at 9. Thomas completed and signed a termination form on October 31,

2002 and sent the form to Guardsmark. On November 6, 2002, LeVerne faxed a form to the Chicago office requesting that the office indicate whether Thomas had been terminated. The 401(k) funds were disbursed to Thomas on November 27, 2002. Thomas filed this lawsuit on October 31, 2002. Guardsmark did not indefinitely suspend any employee in the Chicago area other than Thomas from January 1, 2000 through December 31, 2002.

## DISCUSSION

### I.  Standard of Review

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. Nat'l Human Res. Comm., Inc.*, 218 F.3d 719, 723 (7th Cir. 2000). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

### II. Employment Agreement Limitations Period

Guardsmark moves for summary judgment and contends Thomas' claim is barred by the employment agreement, which required him to file suit within six months of the date the cause of action arose. Guardsmark argues Thomas' cause of action arose in November 2001, and that Thomas knew or should have known of his cause of action at that time. Guardsmark contends Thomas certainly should have known of his cause of action by April 30, 2002, six months prior to

the date he filed his lawsuit. Guardsmark asserts the court need not determine the exact date of Thomas' termination, rather it should only determine whether Thomas knew or should have known of his termination prior to April 30, 2002. In response, Thomas argues a retaliatory discharge claim requires an actual, unequivocal termination, and that Guardsmark fails to show that Thomas' termination was unequivocally communicated to him before April 30, 2002. Regardless of the approach applied - "knew or should have known" or "unequivocal notice" - Guardsmark's summary judgment motion must be denied.

Viewing the facts in Thomas' favor, a genuine issue of fact exists regarding when Thomas was made aware of his termination. Even applying Guardsmark's proposed "knew or should have known" standard, a reasonable jury could find that Thomas did not know or should not have known of his termination prior to April 30, 2002. Healy, who had terminated 30-40 employees in the past, specifically did not terminate Thomas in November 2001 because he was aware of Thomas' pending Title VII suit, and he contends he wanted to investigate Thomas' compliance with company rules. Healy did not ask Thomas to return his uniform, nor did he complete termination paperwork. In December 2001, Thomas' unemployment benefits application was denied because he was suspended, not terminated. In January 2002, Guardsmark's counsel told Thomas that the investigation was not complete and that he would be notified when a decision was reached. When Healy received investigation results from Halm and Peterson in mid-January 2002, neither Healy nor Guardsmark communicated to Thomas that he was terminated. When Thomas sought withdrawal of his 401(k) funds in March 2002, the company sent him a hardship withdrawal form because his employment was not registered as terminated. It was not until after Thomas' Title VII claim was dismissed in August 2002, and after his counsel sent Guardsmark a letter in October 2002, that the termination

paperwork was completed in November 2002. Even then, and as late as October and November 2002, Guardsmark was internally trying to figure out whether Thomas had been terminated, and Guardsmark never sought return of Thomas' uniform.

The Seventh Circuit explicitly declined to adopt a holding that would "invite employers to manipulate their communications with employees so as to avoid liability. Rather than fire employees and risk a retaliatory discharge action, employers would have an incentive indefinitely to 'suspend' them in the hope that they will not realize that they have been discharged until after the limitations period has expired." *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 708 (7th Cir. 2004). It is true that the Seventh Circuit considered the issue pre-discovery and recognized that if Thomas' indefinite suspension became an actual discharge, the contractual limitations period would begin to run at that point. *Id.* Nevertheless, while both parties agree that Thomas was terminated, when Thomas' suspension became a termination remains totally unclear. A reasonable jury might find that Guardsmark went to great lengths to avoid telling Thomas he was terminated, perhaps out of an abundance of caution in light of Thomas' pending Title VII suit or with hopes that the six month period would expire. In any event, the court cannot determine whether Thomas should have known of his termination by April 2002. Guardsmark has not demonstrated it is entitled to judgment as a matter of law on untimeliness grounds.

### III. Retaliatory Discharge

Guardsmark argues summary judgment on Thomas' retaliation claim is warranted. Under Illinois law, a retaliatory discharge claim requires a showing that: (1) an employee has been discharged; (2) in retaliation for his activities; and (3) the discharge violates a clear mandate of public policy. *See Bourban v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000), *citing Hartlein v.*

11

*Ill. Power Co.*, 151 Ill.2d 142, 601 N.E.2d 720, 728 (Ill. 1992). There is some conflict over the approach a federal court should use in resolving a summary judgment motion on a retaliatory discharge claim. *See Carter v. Tennant Co.*, 383 F.3d 673, 678 (7th Cir. 2004); *Borcky v. Maytag Corp.*, 248 F.3d 691, 696 n.3 (7th Cir. 2001); *see also Sandoval v. Calumet Pub. Sch. Dist. # 132*, No. 03 C 677, 2004 U.S. Dist. LEXIS 13237, *37 n.10 (N.D. Ill. July 15, 2004). It is unsettled whether Illinois retaliatory discharge cases brought in federal court should be analyzed using the burden shifting method presented in *McDonnell Douglas*, or the direct method used by Illinois courts on summary judgment. *Id.* In this case, neither party briefs the uncertainty whether the Illinois standard or the *McDonnell Douglas* approach controls. Instead, the parties follow the *McDonnell Douglas* burden shifting approach and dispute whether Guardsmark's proffered reason for termination is pretextual. The court need not determine which approach is appropriate. If Guardsmark establishes a valid, non-pretextual reason for his termination, Thomas' claim fails under either approach. *Carter*, 383 F.3d at 678.

Guardsmark asserts it terminated Thomas for violating GORI and MPS rules. Specifically, Guardsmark contends Thomas violated company rules by: (1) failing to report Kubera's alleged criminal conduct to his supervisor; (2) failing to notify Guardsmark of the media interview request and by disclosing a client's identity; and (3) wearing his uniform outside the course of his employment. Preliminarily, Guardsmark's proffered reasons for termination, Thomas' rule violations, are disputed facts. Generally, an employer's reasons for terminating an employee may be mistaken, so long as the employer reasonably believed those reasons. *See e.g., Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). However, it is unclear whether Guardsmark reasonably believed Thomas violated company rules. For example, viewing the facts in Thomas' favor: (1)

Thomas told Fred about Kubera, and Thomas' supervisor Kempke indicated Guardsmark would deal with the problem; (2) Lieutenant Phil Baldwin gave Thomas permission to participate in the interview; (3) in the interview Thomas did not identify CITGO as the site where he and Kubera worked; and (4) Thomas was not wearing his Guardsmark uniform while on camera.

Even if Thomas violated the rules, this is not a typical case where an employee's misconduct is clearly separated from his protected conduct. The alleged misconduct – or Guardsmark's notification of his actions – occurred *during* protected conduct. The action that forms the basis for Thomas' retaliatory discharge claim – his public interview regarding public safety – is the same conduct that gives rise to Guardsmark's decision to suspend and terminate. Thomas contends he was terminated for publicly speaking out regarding a security guard with a criminal record who guarded CITGO. Guardsmark's proffered reasons for termination touch on each of those actions. In other words, Thomas' alleged protected conduct is closely intertwined with Guardsmark's alleged reasons for termination.

Guardsmark contends the fact that Thomas' misconduct occurred "partially in connection with Thomas' media interview" is irrelevant. Guardsmark Mem. at 11. In support, Guardsmark relies on *Carter*, where the Seventh Circuit affirmed summary judgment for an employer who established it terminated an employee for falsifying answers on a health questionnaire regarding a back injury, not for filing a workers' compensation claim. *See Carter v. Tennant Co.*, 383 F.3d 673, 678 (7th Cir. 2004). Guardsmark's reliance is misplaced. The employer in *Carter* established that the employee falsified documents presented upon hire, in violation of company policy. *Id.* at 676. The employer learned of the document falsification after the employee sought workers' compensation benefits for an injury that occurred pre-hire, and for which the employee previously

received compensation from his prior employer. The employee's misconduct – document falsification upon hire – was separate and apart from his protected conduct.

Thomas' alleged protected conduct – participation in the media interview and his statements during the interview – is the subject of Guardsmark's reasons for termination. Guardsmark contends Thomas' actual participation in the interview violated company policy because he did not obtain prior authorization. Moreover, it is undisputed that the CBS interview raised significant attention internally, that Healy suspended Thomas eight days after the interview aired although he had never suspended anyone indefinitely before, and that Guardsmark did not indefinitely suspend any employee in the Chicago area other than Thomas from January 1, 2000 through December 31, 2002. There is a material issue of fact as to whether Guardsmark took action against Thomas for rule violations or for what he implied or revealed regarding Guardsmark's security procedures in the interview. The intertwined nature of his termination and alleged protected conduct is not appropriate for separation on summary judgment. Guardsmark has not demonstrated it is entitled to judgment as a matter of law on the retaliation claim.

## CONCLUSION

For the foregoing reasons, Guardsmark's summary judgment motion is denied.

March 16, 2005                                    ENTER:

                                                  *Suzanne B. Conlon*
                                                  Suzanne B. Conlon
                                                  United States District Judge